, at this time would counsel for the appellant United States please introduce himself on the record to begin good morning your honors and may it please the court Donald Lockhart for the government with the court's permission I'd like to reserve two minutes for rebuttal okay two minutes for rebuttal and let me before you start let me just pose two or three questions that I'd like to hear both sides answer at some point whenever you think it's appropriate but that way I won't interrupt you as much but there is an issue as to staleness so the question I'd like to hear from everybody is where do you draw the line as to staleness and obviously it might be fact intense in this case but I think that's an important issue to address and then there's also the issue of the good faith defense even if we were to rule the search warrant was stale how do you save the case or if it's defense why can't it be safe so I think those are important issues I'm sure you'll be addressing them but just so you know it's in the back of our minds so please proceed sure let me go directly to staleness your honor so it's important to recognize right at the outset that even the district court recognized that there was plenty of probable cause to do a search of 8 Maryland Avenue just four months before just four months before the search took place the district court said that the search warrant affidavit intricately and amply showed that Michael Mattos and his wife were involved in the search warrant was linked to a drug operation at that address 8 Maryland Avenue but that after they moved to nearby Summers, Connecticut the probable cause somehow evaporated in the course of just a few months so this gets to your staleness point Judge Helpe. Our primary contention here on staleness, and I'll fill in the blanks if time permits, is that this conclusion by the district court judge overlooks three main things. First off, that Carlos Gonzalez, the defendant in this appeal, was also involved in this drug operation, the evidence from the affidavit shows. Number two, that Gonzalez and his girlfriend had both ordered pill making equipment for delivery to 8 Maryland Avenue and both remained at that address right through the day of the search. And number three, that Gonzalez and Matos were supplying fentanyl pills with unique markings from the 8 Maryland address to Hector Ramos' garage with the last of these controlled deals taking place in the second week of December 2021 which is just about six weeks before the search. With the court's permission I could fill in some of these blanks and focus on the affidavit facts running from essentially mid-July of 2021 through the date of the search. Remember that the, I'm sorry, Rickleman. Thank you for noticing that I had a question. I do have a, I think as you said really the question here is after they moved what happened? And I don't recall in the record the controlled buy that you're talking about at Ramos' shop. I guess it would be really helpful for me, for you to focus because the pill making equipment that you referenced, I believe that was ordered before the move in early September. I don't see a reference to a controlled buy in December. I'm just looking at the very specific things that happened between September and the time of the search in that four and a half months. So maybe you could really focus us on that. Let me drill down on that, Your Honor. Remember, just so that we have the timeline straight, the Mattos family buys the house in Summers on July 1st. They move there based on sightings of a U-Haul van on September 6th. That's 2021 just for the record. That's 2021. So let me pick up with the controlled buy that is in early September-ish 2021 because now we're talking about the period when they're in transition to make the move. And then I'll quickly get to post-September 6th evidence. But I think for context, you kind of need to be aware that in late August, early September 2021, we have the second of two controlled pill buys for the 8-215 pills at Hector Ramos' garage. And just before that, a Ford pickup truck registered to Mattos' wife at 8 Maryland Avenue arrives at the garage and a Mattos associate by the name of Corey Singleton gets out of the truck. So just before that late August, early September A-215 pill deal, we see- That's August 30th, right? The week after August 30th is what the affidavit says. So it could actually encompass September 6th. But we're including it in the narrative because it's important context for what comes next. Let's move to September 13th, 2022. At this point, we know the Mattos family has moved. And it's important to note that the events of that day are not described at all in the district court's suppression ruling. What happens on that day, after Mattos has moved his family to Connecticut, is that Mattos and Gonzalez drive from 8 Maryland Avenue to Hector Ramos' garage in a Chevy pickup truck registered to Gonzalez. And they have a meeting with Hector Ramos. And you'll recall that this meeting isn't just any meeting. It's a situation where Gonzalez is in the truck and initially Hector Ramos and Mattos are having a conversation some distance from the truck. And then Mattos beckons Gonzalez over to talk with them. Then all three of them go inside Hector Ramos' office at the garage for several minutes. And then when they come out, what happens? Gonzalez and a man with a fanny pack get in that Ford pickup registered to Mattos' wife. And they return to 8 Maryland Avenue. And it's just a week prior to that that we have the second of the two A slash 215 pill deals. Counsel, I agree with you that the September 13th event is the best in the time period, assuming the move really is complete on September 6th. But I guess my question for you is that's within a week of the move. After that point, which is still four months, it's actually a little over four months before the search, I really don't see very much in the record, to be honest. And so it's also a very unique situation because I don't think you cited any facts to us where the person who was leading the conspiracy moves from the home. And then there's very little after the fact. I totally disagree with the very little characterization, Your Honor, because I'm about to explain to you that only three days after the transaction I've just described, the September 13th transaction, we move to September 16th, okay? The Ford pickup registered to Mattos' wife drives from 8 Maryland Avenue to Hector Ramos' garage. And who is there? Again, Mattos and Gonzales, both seen at the garage at that point. And there we have a man who places a garbage bag in the pickup truck. And what happens right after that? Gonzales drives off to a Walmart where he buys $460 worth of pill processing supplies, digital scale, heat sealer, vacuum sealers, vacuum sealer bags and rolls that could be used to make the exact sort of heat seal bags that contain the drugs that CI3 bought at Hector Ramos' garage. And after a brief stop in Springfield, he returns to 8 Maryland Avenue. Isn't the problem that the affidavit really doesn't get, it doesn't really have any facts to suggest that what was purchased at the Walmart was unloaded at 8 Maryland Avenue versus at Springfield where they were there and backed up the truck with the back of the truck near the garage, et cetera? Disagree entirely for the following reasons. Look at how it unfolds. First of all, Gonzales, when he makes these purchases at the Walmart, he's with several other guys. He's the one who buys these items, not the other men. They go to Springfield, and you're right, they back up to a garage. That's all true. No one sees anyone carrying anything into the Springfield house. Remember, a garbage bag has been loaded into that pickup truck at Hector Ramos' garage. There are other things that could be loaded from the pickup truck into the Springfield address other than the Walmart supplies. But then consider the fact that the very man who has purchased these items then goes back to 8 Maryland Avenue where he lives and where we know historically has been a pill-making processing place. But, counsel, he always will eventually have to go back to where he lives, and the affidavit also doesn't see them unloading those materials at 8 Maryland Avenue. So what you said about Springfield, the same can be said about 8 Maryland Avenue, and again, of course, he's always eventually going to have to go back. So I'm just not sure that this particular incident establishes as much as the government would like it to. Well, no particular incident tells the whole story. I mean, that's why we have to look at all these things in their totality. And remember, we have a long-running pill processing operation here that dates back to 2018, and we move forward through 2020, 2021. This is a place where Matos has made $900,000 at least in cash proceeds according to the affidavit. Look at it from a common sense standpoint. He's essentially hit the jackpot at 8 Maryland Avenue to the tune of $900,000. What sense would it make from a commonsensical standpoint to move your base of operations from a place where you've had a huge spring of success for several years, take it down to, what, a residential house that you've purchased for your family over the border in Connecticut? Common sense tells you that it just makes no sense. The idea that he would have just picked up shop, taken all of his drug processing supplies, moved them down there with his family, there's nothing to indicate that the Summers property played any sort of role like this as a hub in the conspiracy. Counsel, could this explanation you're giving now, could you tie it into your argument because we're dealing with probable cause, which is a very, very low threshold. If you can just tie it to the probable cause because, again, we're not dealing with a preponderance. We're not dealing with a higher burden. How does that tie in? And I know you cited in your brief a plethora of cases where there's like five months, two months, two years. But for purpose of probable cause, it might be good for you to argue what probable cause is. Yeah, of course, Your Honor. So, yeah, the probable cause standard, as we've said in the brief, dating back to 1979 in this Court's Melvin decision, is it's a less than 50-50 proposition. And that sort of relates to Judge Rickleman's arguments about, or points, rather, about, well, how do we know that he didn't drop off the Walmart supplies in Springfield versus Maryland Avenue? Now, we think that the evidence preponderates in favor of an inference that those supplies were taken to 8 Maryland Avenue. But let's say it's just a 50-50 coin toss. I mean, probable cause is even lower than 50-50. That's what I've just said. So what my argument is, Judge Halpe, is that let's just assume that it's a coin toss, as Judge Rickleman's question sort of posited. We still win, because the standard is less than 50-50, and we can take it to the bank that we can run with that inference, the inference that the materials were taken back to the Maryland Avenue address, based simply on the legal proposition that from Melvin we know that that is enough to form that inference. But more broadly, there's another sort of line of decisions that come into play here, which is that the law is very clear that an agent does not have to exclude all plausible explanations of innocence. That sort of hornbook, Fourth Amendment... Well, for purpose of probable cause, it's not an issue about innocence or any defense. It's simply, well, you have objective probable cause. Well, that's true, but innocence in this context, I'm not meaning innocence of the substantive offense. What the court has said in the Fourth Amendment context is that to the extent there could be innocent explanations for a defendant's behavior, as set forth in the search warrant facts of the affidavit, the agent does not have to sort of rebut all possible innocent explanations of conduct. So we have a plausible innocent explanation here about the truck backing up to the garage in Springfield. Maybe they were unloading the Walmart supplies, but that's not enough to defeat probable cause. Okay. I know your time is up, but if you could address maybe for about two or three minutes the good faith issue. And for purposes of that, assume we were to find that there's staleness. Why would good faith save the day for the government? Right. Well, although we strongly encourage you to agree with the magistrate judge that there was probable cause for the search, this is certainly not a situation in which a reasonable officer would have realized that the search was unlawful, notwithstanding the magistrate judge's authorization. The Leon good faith inquiry in this case, which is a case of impropriety beyond the four corners of the search warrant affidavit, really trains on the question of just how far short of probable cause were we. Probable cause. Can I ask you a question regarding Leon? Are you aware of any case within the sort of circuit where we have addressed the circumstance where staleness is the asserted reason why an affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable? Yes, Your Honor. I believe three of them come to mind. Well, three address staleness, sorry, in the probable cause context, but not Leon. But it follows from the decisions I'm about to cite that if the information is established as probable cause, that it's certainly good enough for Leon. I'm not aware of a decision off the top of my head which rests a sort of, rejects a staleness claim simply on a Leon basis. But I would direct the court to Schaefer, TM Trenn, and Feliz. In Schaefer, the evidence was two to three months old. That was found to be probable cause. TM Trenn, two months to five months old evidence, probable cause. Feliz, three month old evidence. And yes, all these cases are factually idiosyncratic. But if you look at them and you look at the other circuit court cases that we cite, both on the probable cause front and on the Leon front, what you see is a very strong trend that in longstanding drug operations like this one, which is run from 2018 forward at least into late 2020, if not 2021, that staleness concerns typically don't arise even when the main evidence supporting the search warrant affidavit is months or even years old. So there's a general trend in the case law. And the district court's decision stands well outside that body of precedent. But to return to your Honor's point, off the top of my head, I'm not aware of a First Circuit case directly resolving a staleness issue based on a Leon-only foundation. Let me ask Judge Rickleman or Judge Katman any further questions. You're going to have some time for a vote also. Okay, so thank you. Just for clarification, it's a family question, and that's the family relationship. I just want to make sure that I understand the family relationship between Michael Matos and the defendant's sister. He's married to the defendant's sister? So we have to be careful there, Your Honor. The district court made that point in its suppression ruling, but the affidavit does not, the search warrant affidavit does not explicitly state the relationship. You can, however, see from different points in the affidavit that Michael Matos' wife's surname is Gonzalez. You can also see from the affidavit that when CI2 was in that place three times, having his heroin turned into pills, he said that there were people who appeared to be young relatives of Matos there operating the pill machinery with him. So you get the flavor that there is a relationship, but I think we need to be a little bit careful because the affidavit does not, as far as I remember, come right out and say that these guys are brother-in-laws. And Gonzalez is like St. Smith. Right. So again, I think although the district court made that point in its ruling, probably need to be careful about it because it's not within the four corners of the affidavit. Okay. Thank you. Ms. Thompson, your turn. Please identify yourself for the record. My name is Linda Thompson. I'm representing Mr. Gonzalez at this argument, and my co-counsel is James Goodman. And you know what the advanced questions are, so. I do know what the advanced questions are, and I think that Judge Mastriani was very also focused, especially on the Walmart. Let's wait just a second. The timer hasn't started. That's okay with me. Okay. Go ahead. Okay. Judge Mastriani was also very focused on the Walmart, the September 16th Walmart trip. The first thing I'd like to point out is that the affiant, who was also the affiant in the Roman case, who was found to have misrepresented his personal knowledge, and that resulted in the suppression of the evidence in the Roman case, which was also Judge Mastriani's case. Was that appealed? Yes. The circuit court upheld Judge Mastriani in Roman, and the Roman decision points out that Scott Smith was the affiant in that case. He's the affiant in this case. But that case is not related to this case. Well, except that it was the same judge with the same affiant. Okay. But there was no Franks hearing here, so we have no reason to think. No, there wasn't a Franks hearing here because the government asked to not have a Franks hearing. No, I know there was a request, but I'm just saying we have no basis in the record to assume that what happened in Roman happened here in terms of the affiant. Well, I think that there is a basis in the record because, first of all, the Roman case is a published opinion in both the district court and the First Circuit, and the fact that this affiant was found to have been untruthful and omitted information in that case is not related to the Roman case. It's not related to the magistrate in this affidavit. So she has no reason to understand that this is a person whose credibility may be very questionable. Okay, but that would be something, as Judge Riggleman said, for a Franks hearing or, you know, if it goes to trial, you know, credibility. But if it wasn't brought up, we have to assume we can't use that case for purposes of saying there's no parole clause. Well, I'm just saying that Judge Mastriani relied on that case in writing this opinion, and the government did not address it at all in their opening brief, Judge Mastriani's opinion. But what I'd like to get to is the fact that the affiant at the time of the Walmart trip on September 16th did not know who Gonzalez was, couldn't recognize him, and he says in the affidavit that he recognized him by getting in touch with the RMV, running the license plate, and getting a photograph of Carlos Gonzalez. And then on September 16th, he was able to identify Gonzalez from his driver's license photo. But Judge Mastriani found that as a fact, I would say, that the, you know, that the driver's license plate, and inference that the materials bought at Walmart or received anywhere else were likely unloaded at 8 Maryland Avenue instead of on Norman Street in Springfield, was counterintuitive, because everything that the truck did at Norman Street was indicative of trying to conceal what they were doing. They were not in the open, they backed up to a garage, they could have unloaded things, everybody got out of the car, that could have happened. Then the car leaves there, parks in the open at Merline Avenue, and there's a photograph in the search warrant affidavit of the driveway in the house at Merline Avenue, and nothing was unloaded there. And then there were government representations at the hearing, and at the hearing, those government representations included the family relationships that are cited in Judge Mastriani's opinion. Counsel, I read carefully your arguments about September 16th in your brief, and I think you make some good points, but I think what the government is arguing here is, again, probable cause is not that high of a standard. You can make common sense conclusions, and I think it's a strong argument to say that there's a good common sense basis for thinking that somebody wouldn't move their drug operation that's been going on for over three years at this one address and has been able to continue, has not been uncovered yet. It could very well be common sense to conclude that the person will keep the operation there rather than moving it into their new personal home. So can you address that point? Yes, I'd be happy to. The affidavit itself starts out with 22 paragraphs of training and experience for the affiant. None of them do anything but suggest that a drug dealer, especially a big drug dealer like Mr. Matos, you know, Mr. Gonzalez doesn't really show up in this affidavit until the 13th or so of September. So it's just that he lives at this house. So I'm sorry, what was your point? I was hoping you could address the argument that the government made, which is that it's actually a common sense conclusion to think that Matos would keep the pill operation at 8 Maryland Avenue because it's been there successful, it hasn't been discovered for over three years. So why move that into his own personal home in Connecticut? First of all, the affidavit makes it clear that any evidence they have about the pill operation being at Merline Avenue by the time they get it is already a year and a half old. So they have no current observations of anything going on actually at the address. No CI, nobody addresses that. How do you deal with, because the government has cited plenty of case law and some even going up to two years, you know, months. My same question I ask the government, where do you draw the line? Is it two months, a month? I don't think this is about passage of time. I think that this is about relocation of the target person who is undoubtedly Mr. Matos. So that's what the court focused on. You don't have, there's no, nothing to connect drug dealing after Matos moves to the place he moved from and all of the training and experience that he has, that expresses the fact that a drug dealer would keep all of these things that they want to search for, which is quite a list of things they want to search for, near him, close to him, at his residence. But he continues, I think, you know, again, I guess what I'm trying to ask you, Matos continues to own 8 Merline Avenue. He moves to Summers, Connecticut, which I think is only about a 15-minute drive if I've got my geography correct. So what about the government's argument that it is common sense and certainly enough of an inference to satisfy the relatively low probable cause standard that he would just keep the pill operation where he had been successfully operating for three years at that time, rather than putting it into his own personal home? Well, that was his own personal home, 8 Merline Avenue was his own personal home. And he would keep it when it's been successful in that location for over three years. I guess that's what I'm asking you to address. Okay, well, if you notice in the search warrant affidavit, they say they're not only submitting that affidavit in support of a warrant for 8 Merline, but also in support of a warrant for the Connecticut address. So there's clearly some reason to think that the Connecticut address is involved. One of the things I'd like to point out that Judge Mastroianni was concerned about in Roman, in the Murray case he cites, and in this case, is getting into a home, which is the first among all places supported where probable cause must be the strongest to get into a person's home. And in the search warrant affidavit itself, the affiant cited a Third Circuit case, which is true. But it's really not consistent with the First Circuit law that says you have to have more than just a drug dealer who has a resident. You have to have specific facts tying that information to the defendant's residence. And when there's more than one place, the defendant's residence is the last place you really get into. So Judge Mastroianni was very careful, and he actually included many more facts in his opinion than he did in the first affidavit. And then the government included in their application. So if the court decides that this little bit of common sense would contradict the fact findings that Judge Mastroianni made, I think common sense tells you that if this is a drug dealer, and he's moved his operation under everything that's listed in the affidavit, that's where the stuff goes with him. And as you can see from the affidavit, if you've read it, it's quite dense. And Judge Mastroianni had to read it a number of times to even figure out the sequence of events. So I would like to direct my attention to the good faith. I was just going to ask you, but let's ask Judge Kastman, he has a question. I just have one question, counsel. And that takes us back to the judge, the opinion that United States v. Floyd, 2014, the first circuit. And where the court said, as you know, courts have sometimes upheld probable cause determinations based on years-old information. Everything depends on context. Within this framework, and in the first circuit, drug-related evidence, as my colleagues have noted, tends to preserve its timeliness for longer than other classes of evidence. And then in the TM Trim case, we repeatedly recognize that drug operations, when shared in the darkness of relative obscurity, often germinate over a protracted period of time. Thus information that might otherwise appear stale may remain fresh and timely during the course of the operation's progression. So this, again, takes us back to, we understand, I understand, I think, your arguments. But in the final analysis, isn't it really a relatively low bar for establishing probable cause in this context? It is a low bar. The Leon court said, however, that they were not hampering with the probable cause standard under the Fourth Amendment. In the TM Trim case, Judge Mastrianni asked the government specifically, basically, how hard would it be to move this operation? It involved two suitcases, a handful of dyes, which everybody agreed could fit in your hand, and there was no description of any operation in the basement of 8 Mariline Avenue. So what happened was two CIs say they learned how to make counterfeit pills there. They didn't describe anything else. And the judge asked specifically, was there anything like security cameras or ventilation systems, something that would make it easy to move, hard to move? And the government's lawyer said, I looked, and there are no specifics. So I think that the absence of specifics between the time that Matos moves from Mariline Avenue until the search warrant is executed, there is nothing there. The best that the government has been able to say is that in January of 6th and 7th, of 2022, there were trips that were family trips that could easily be construed as family trips, trips to Panera, trips to pick up kids at elementary school. But in between that time, in between the time of September, let's say, 6th, and the issuance of the search warrant, there is nothing involving Mariline Avenue. There is not a single fact that points to Mariline Avenue as a place where things happen. So it's just a tabula rasa, so to speak. During that period of time, there's four months in which there's really no evidence of drug dealing occurring at 8 Mariline Avenue. And before that, there isn't much evidence either. So it's just that in 2019 and 2020, CIs were there and they saw things. This affidavit was put into a context where, for example, on the controlled buys, when Judge Mastriani asked the Assistant U.S. Attorney about the controlled buys, his response was, oh, those were to establish probable cause for Target Location 2. They were not related to Target Location 1, which was 8 Mariline Avenue. Counsel, we could go to the... Judge Kedman, do you have any other questions? Yes, absolutely. Just one clarifying question, please, from me. And that is our standard of review. Counsel, it seems that you are arguing that our standard of review is for clear error. Why isn't our standard of review de novo? It is de novo. I agree that the standard of review for conclusions of law is de novo. And for good faith, the review is de novo, and that's stated in our brief. The facts are reviewed in the light most favorable to the appellee in this case, to the ruling. And if facts are found, those are reviews for clear error. And I believe, and Justice Judge Turwaya had said, we have a bifurcated approach to review here. The law is reviewed for de novo. Facts are reviewed for clear error. And so Judge Mastriani did find some facts in this case. He didn't have an evidentiary hearing, but he did have a number of representations from the government, including its reluctance to have another grounds for suppression, which would be the Franks issue. And the Court is quite clear in Leon that Franks is an open issue when there is inadequate probable cause. So Franks does say, I mean, Leon does say that the good faith exception is for concededly invalid, constitutionally invalid warrants. Okay. Counsel, let me ask you about the good faith. We have here a federal magistrate judge who signs the probable cause, signs the search warrant. So when the agents are executing, they're relying on that warrant. And again, Franks, it's not before us a Franks issue. So why doesn't the good faith exception apply to that federal magistrate judge who signed this search warrant? Because the agents are relying on that search warrant. The agents are, but Leon also says that you have to look at the affiant's good faith. And in this case, the affiant was a person who had already been found to misrepresent his own personal knowledge. But that would have to be a Franks hearing. Well, it seems to me that that ignores the fact that it was, as the government points out, that this was published opinion, that this affiant had already been found to misrepresent himself. And it seems to me with all of the energy that is put into confirming the credibility of, for example, confidential informants, that it would be okay for an affiant who has been found to be misrepresenting his knowledge to have to admit that in a search warrant affidavit. It seems to me that that would be the first thing. I don't even know why they use somebody. This affiant could have misrepresented the truth or five, six, ten occasions of the published opinion, but how do we know he did it here or didn't do it? Because that would be once a liar, always a liar, or once a thief, always a thief. But there was no Franks hearing, so there's no other hearing to determine that. There was a reason there wasn't a Franks hearing. The government did not want to have a Franks hearing. They said we rise or fall on probable cause. If I'm out of the box, I'm out of the box. If there's no probable cause, we're done. And that was the government's position in front of Judge Mastrianni. And so the fact that you could have a Franks hearing, which would challenge any lie on good faith, the government did not want that hearing. And if they wanted it, they could have asked for it because there are cases in which... But the government doesn't ask for Frank hearings. It's always the defense. The government could have asked for a Leon hearing. There are cases in this circuit where a Leon hearing has been held on staleness. Okay, but you were mentioning Franks hearings, and the defense has to request that. The defense did request it, and the government said we don't want to have a Franks hearing. We don't want to have a Franks hearing. We rise or fall on probable cause. That was their position below in front of Judge Mastrianni. They said no Franks hearing. And in fact, at this point, Judge Mastrianni and with the government's agreement has said there can be a Franks hearing. If this is sent back, there can be a Franks hearing. But the government said if you rule in the defendant's favor, that's it. We don't want any more than that. But if you rule in our favor, we agree there can be a Franks hearing. So if we were to reverse Judge Mastrianni, the case would go back to him, and then your client would be entitled to a Franks hearing if he properly requested, correct? And that brings up the question of why there wasn't a Franks hearing. I mean, we don't usually come before the First Circuit and say, look, we've got part of a ruling on a motion to suppress. And that was in favor of the defendant. And now if that's reversed, the defendant gets to go back and make another motion. And the government said no, no, we don't want that. That's not what we want. We want a decision on probable cause. Okay, but if the government prevails now, then there's no prejudice of your client filing a Franks motion. Well, except the expense of litigating that motion and the time and the energy of litigating that motion, which is why the government didn't want to do it. The government said we don't want another suppression, another grounds for suppression. It's either probable cause or not. Anything else, Counselor, of Judge Katzmann, or does Rickman have further questions? I have one thing I'd like to say. Yes, please. One minute. This depends on a neutral and detached magistrate. And the government has asserted in its reply brief that this magistrate gets papers that are not sworn, reviews those papers, discusses with the prosecutor any deficiencies, and then eventually an affidavit is made out that satisfies the magistrate. And then that affidavit is sworn to. That is not a neutral. That's a person who's participating in the probable cause effort. And it's not a neutral and detached person who's looking at the affidavit and saying I find probable cause or I don't find probable cause. And I think that's a very serious issue. Now, the government doesn't cite any cases, and it doesn't cite any rules that permits this sort of interaction between. But let me ask, you know, I was a magistrate judge many moons ago, and the practice is you meet, and now I've heard this is hearsay, but apparently this is what's happening. It's done electronically or by video. In the good old days, it was done in person. But what usually happened, the prosecutor will go to the magistrate judge's chambers with the fiance, and they'll either submit that. And sometimes the magistrate judge will say there's not enough here. I'm not going to sign it. And it happened to me a couple times. I said I'm not going to sign this. And they go back. They'll bring it up. And is there any case law against that? Because, again, the magistrate judge is not necessarily telling you you have to do this or, you know, there's a separation of powers issue, but this is an ex parte proceeding. It's analogous maybe to a grand jury. Defense is not there. The prosecutor is there. But they're going to the magistrate judge to get that warrant. So is there any case law saying a magistrate judge cannot meet ex parte, cannot say, well, this is not sufficient, you have to redraft this or not present this, or I won't accept it? That's not what the government is alleging here. The government is alleging a sort of cooperative, we're going to figure out what satisfies the magistrate for probable cause by dealing with the magistrate. That seems to me to make the magistrate a participant rather than a neutral and detached person. I understand you, Judge Helpe, said, okay, this isn't enough, go find more. But my guess is you didn't say I want you to get more evidence about this, this, and this, and then I'll be happy. So I can't tell what happened here because there is no record. There is no record of what is happening with the ‑‑ And there's never a record when agents and a prosecutor go before a magistrate judge to request a search warrant. That's not an under record proceeding. The under record is the affidavit. Once it's signed and it's approved, that's what goes in the record. What you're saying is that what happens before, there's no record, you have no way of knowing, and that's why you go to the neutral and detached issue. Right. The magistrate is supposed to be separated and is supposed to get this affidavit, look at it, and either issue a warrant or not. Okay. Thank you, counsel. Let's hear then from Mr. Lockhart. Mr. Lockhart, you have two minutes, but it might take a little ‑‑ you might want to address the ‑‑ you might want to start by the neutral and detached magistrate judge, since it's fresh on our minds, and then I'll give you another minute if necessary. I'm happy to do that. I think we're omitting the context for the argument on this point. There was an allegation made for the first time on appeal by the defendant that because the search warrant materials were dated January 20th and the warrant was issued at 9.31 a.m., that that indicates that the magistrate judge did a speed read of the materials. To rebut that suggestion, we just point out that it's common practice, as Judge Helpe has pointed out, for there to be a more interactive relationship between magistrate judge who may have legitimate concerns about a search warrant and the prosecutor. So these things are often submitted a day or more in advance to the magistrate judge, and then if there are any issues that we need to clear up, we do that. But the mere fact that the materials are dated the same date does not create an inference that this magistrate judge somehow came to work at 9 in the morning and cranked out the warrant half an hour later. So that's the context for the debate that we're having. I think it's extremely important for me to address the Leon point. I was going to ask you that. Yes, because there are two suggestions which we believe are misleading. First of all, in the district court, there was a Leon argument that was discreet and it was not anything having to do with Agent Scott Smith's role in the earlier Roman case. The Leon argument that the defense made in the district court was a suggestion that maybe the defense attorney might have found evidence that one of the CIs received some form of consideration. The defense attorney had no evidence to support that accusation, and so Judge Mastroianni said, if you come up with something like that, we'll revisit it. Counsel, you're talking about the Franks issue, not the Leon issue, right? Oh, I'm sorry. Yes, I meant to say, sorry, Franks. I often get those two confused. Yes, the Franks issue. It's extremely important to note that at no time did the defense say that Roman indicates that this agent is an inveterate liar. There was no argument made to that effect in the district court. And the second misleading suggestion on the Franks issue, sorry, is that somehow by citing Roman, the district court in its opinion was importing some sort of a Franks determination about the agent. The district court judge was citing Roman just for the legal propositions in that decision. The judge was not citing Roman for any sort of proposition that Agent Smith was faulted in the earlier Roman case, therefore he's suspect in this case. What I asked opposing counsel, he cites the case for the legal context, but he doesn't make a finding. This agent wants a liar, always a liar, and I'm relying on that case because he lied. There's no finding of that. Correct. And before I run out of time, I need to address Judge Rickleman's point from before that she didn't see any evidence of any December 2021. I'm sorry, I'm wrong on that. I know which buy you're talking about now, the December 6th controlled buy. Can I just say in connection with that buy, it's for M30 light blue pills, the very sort of pills that were taken from Mattos' toolbox back in 2018 when he was living at 8 Maryland Avenue. And yes, is it possible that those light M30 pills came from Summers, Connecticut instead of from 8 Maryland? Sure, it's possible. But is it likely? No, it's not. Because again, the idea that they would have taken this long-running drug factory, essentially, where it's not just Mattos churning out the pills. We know from CI2, it's young relatives of Mattos as well, that they would take that factory, uproot it, and bring it to a family dwelling in Connecticut just drains crudulity. Counsel, I do have to follow up on Judge Katzmann's question because it was also something I was thinking about. The standard of review issue, if you could just address that, because there is generally the principle in our case law that we review the lower court's decision in the light most favorable to the Supreme Court. So I'm wondering if you can address that and also address the question of, you know, were there sort of factual findings that were part of Judge Mastroianni's ultimate decision to find lack of probable cause here and how we can break those apart? So all of those standard of review issues, that would be helpful. Yes. Okay. So we start from the sort of hornbook proposition that probable cause is reviewed. And no, of course, there's a suggestion by the defense that, well, when a district court judge is evaluating the affidavit facts and sort of weighing the significance of them, the relationships between them, the weight to be given them, that somehow that stands apart from the probable cause analysis. We have a couple points in that regard. First of all, that's just intrinsic to the probable cause analysis itself. The district court judge and this court don't stand in a different position when you're looking at the finite static facts set forth in the four corners of the search warrant affidavit. As sort of an intrinsic part of the probable cause analysis, you're making judgments about those facts. But I'd like to address the Roman case because this is where it gets a little bit trickier. The defense cites Roman sort of suggesting that that supports the idea that sort of interstitial fact-binding in the context of a probable cause decision concerning a warrant is reviewed for clear error. It's important to note that in Roman, as we say in the brief, there was a Franks hearing. And so the district court judge is considering not just affidavit facts but also evidentiary hearing facts from the Franks context. But, counsel, what about the ultimate suppression? Are we supposed to review the ultimate ruling, which here was suppressed in the light most favorable to that ruling? That would make no sense. It would be counterintuitive. The ultimate ruling in the suppression context has never, to my knowledge, been applied in a four corners review to say that somehow we review a district court's probable cause fact assessments in a warrant context with any level of deference. I guess what concerns me about it, though, is there is definitely case law that says that, and I'm concerned about just applying that standard review in one direction. In other words, we review it with deference to the suppression ruling when the ruling is don't suppress, but we don't when the ruling is do suppress. No, I think the distinction is between warrantless and non-warrantless searches. It's not a question of a one-way door which swings only favorably to the government, okay? You can imagine a warrantless search case in which there's a decision adverse to the government and we're up on appeal. The defense certainly gets to the benefit of those facts in the light most favorable to the decision granting suppression. So there's no asymmetry as between the parties. Where the distinction comes up really is between warrantless and non-warrantless searches. And in the warrant search context, given that we're dealing with just finite, static facts found within the four corners and the district court judge does not have any superior coin of evidence, there's no advantage over this court in that context. That's why this court has said time and time again, it's de novo review. And so that principle, we believe, really sort of supersedes this more general idea that we defer to fact findings or we look at suppression rulings in the light most favorable to the record. Okay, thank you. Sorry. No, go ahead, Judge Katzman. Just to follow up, counsel, so your home run case, in your view, that would stand for the proposition that where there is a suppression ruling in the context is of a search warrant, that the standard is not looking at the evidence in the light most favorable to the district court ruling suppression, but that it is probable cause, that that is de novo review by this court. In other words, you're pointing to sort of logical explanations, I understand. But what's your home run case that clearly says what you're saying? Well, I would say just the dozens upon dozens upon dozens of cases in which this court has said that probable cause review of a Four Corners affidavit situation is de novo. I mean, I guess the only thing I could add, Your Honor, is that the Supreme Court's decision in Ornelas, mid-1990s decision, is where we sort of get this due wait, clear concept and clear error review of facts concept. That case is not a warrant case. It's a situation where there was no warrant. So the Supreme Court's language, the due wait language, which pops up again in the Roman context, is being used in a specific context, and that is an evidentiary suppression context, not a warrant case. It's not a warrant context, but a non-warrant context. And so from our standpoint, Ornelas and the many First Circuit cases that have applied the de novo standard to probable cause decisions concerning Four Corners analysis just sort of preclude the invocation of this more general doctrine that Judge Rickleman has been talking about to somehow supplant that case law. Thank you, counsel. Thank you, Ms. Thompson, also, and have a good day.